Mr. Beale. May it please the court, counsel. I'm going to briefly describe the development which all three loans in this case were related to, and then I'm going to address the impediments that Judge Norgel created in this case. This is a case about a development that started right after September 11, 2001. Two developers had loans and they got into arrears when the real estate market froze up. They asked Lunn Partners for a bridge loan, a $2.8 million bridge loan, and Lunn Partners client Robert Shaw, who testified in the trial in this case, and a partner of his, provided the $2.8 million bridge loan. Scotty Pippin, another Lunn Partners client, bought out half of that bridge loan with his loan from Leaders Bank, that's one of the loans that's at issue in this case. Then the developers turned out they couldn't get back on their feet, and so Lunn Partners took over the properties that the bridge loan related to, including the property at 119th Marshfield in Chicago, and that's the property that all three of the loans in this case went into. Mr. Lunn used the Garris loan and the line of credit to carry that property while he decided whether to develop it or sell it. Simultaneously, he had decided to sell it and he had a falling out with Scotty Pippin at the same time, and Pippin was a major client of his, and Pippin forced him into bankruptcy, and in the bankruptcy, the property was sold to a developer who proceeded to develop it, and it's now sitting on I-57, 119th Street, the Target store, which was always the anchor tenant, was built and is there, so this ended up being a successful development. Now, turning to the three loans, Mr. Lunn's effort to testify about these loans and explain to the jury what his intentions were, the center of this case was his mens rea with respect to all three loans, and Judge Norgal continuously impeded his efforts to do so. Part of the reason for the impediment was that Judge Norgal didn't understand the case, and I would direct the court to Mr. Lunn's direct examination. We spent about 20 pages talking about the Pippin loan, and this is after the government had spent two days proving the Pippin loan, bringing on the bank president, bringing on the loan officer, bringing on Scotty Pippin, bringing on two board members of the bank to prove that Pippin had taken out the loan, and the judge says at page 805, part of the issue, he says to Mr. Lunn, you are continuing to say the Pippin loan. It's the government's position that there never was a Pippin loan, and I say, Judge, this is the Pippin loan. I was using it in the examination, and Judge Norgal turns to the prosecutor and says, is that right? And Mr. Yadin says, Pippin signed the first promissory note, meaning there is a Pippin loan. So the judge had a fundamental misunderstanding of the case, which affected rulings that he made, and then during the course of the testimony, there were, for example, he limited Mr. Lunn to testifying about the precise words that Mr. Lunn and someone he spoke to had said to each other 12 years before, and if Mr. Lunn couldn't state the precise words, he couldn't testify. There's no rule that says you can only testify about the precise words actually spoken, is the phrase Judge Norgal used, and similarly, he would not let Mr. Lunn testify about his credit from the bank. Mr. Lunn testified that he believed that his financial statements accurately conveyed his net worth to the bank, which is what he was trying to do. Judge Norgal would not let him tell the jury what he thought his net worth was. Rather, Judge Norgal required Mr. Lunn to identify the specific stocks and other holdings he had 12 years before, and that was all that he would let him testify to the jury about in terms of, in order to establish what his net worth. Counsel, wasn't the issue, though, whether the personal financial statements he submitted were accurate, and whether he honestly believed they were accurate at the time? The government's position was that the statements contained, stated that he held Morgan Stanley and Lehman Brothers stock, which he acknowledged that he didn't hold. His position was that, in his mind, the statements were accurate because they accurately conveyed his net worth, and he had no intent to defraud the bank because he was accurately conveying his overall picture. Now, that's a question for the jury in terms of whether what he was doing was fraudulent or not. I mean, as a matter of fact, he had acknowledged that he did not hold the Lehman Brothers and Morgan Stanley stock at the time those documents went over. So he acknowledged they were inaccurate. That's right. Now, they weren't prepared. Remember, these were financial- Why isn't that the end of the case? Because these financial statements had been prepared on other occasions. That's fine. But when they were submitted to the bank here, they were concededly inaccurate. And I don't see why it matters that somebody says, well, I totally lied about this $7 million in assets, but I had other assets, so this was a safe loan. As I understand the law, your belief that the lie didn't matter is no defense. One of the financial statements was not in his handwriting, and there was no evidence how either financial statement actually got from one partner's to Leader's Bank. I mean, somebody sent it. And so it was not clear what Mr. Lund knew was on the statements, precisely what was on the statements, at the time they went over to Leader's Bank, as opposed to- We keep hearing arguments that this contract or this representation didn't bind me because I didn't read it, and they don't really work very well. Well- If you tell a bank you have $6.8 million in liquid assets, when in fact all of your assets are illiquid, and they may or may not have a particular net value, both the deceit and the materiality are, I should think, pretty clear. Yes. The distinction I'm trying to draw here is that the way these particular financial statements went over, they were prepared on different occasions for different banks, one for Northern Trust, one for Associated Bank, and were basically saying Mr. Lund didn't- Because Leader's Bank wanted a financial statement, Mr. Lund's perception was that they accurately conveyed his net worth because his net worth didn't change during that period, and he was kind of oblivious to the specifics. He didn't know exactly what was in them at the time they went over. Did he sign them? He didn't. Well, the question is when did he sign them. I'm sure he signed them. I don't remember off the top of my head, but I'll concede that he signed them. But again, not at the time they went over to Leader's Bank. He signed them at the time they went to Northern Trust or Associated Bank. He asked Leader's Bank for an increase in his line of credit, and he shortly signed a document saying here's my correct financial statement. Is there any doubt about that? Yes. Somebody at Leader's Bank said we want a financial statement, and Lund Partners- The second one would have been the Associated Bank statement sent over a previously prepared financial statement. They did it in both instances, but they sent over a previously prepared earlier dated. It was not dated at the time Leader's Bank requested it. He just sent over a preexisting financial statement, or I should be more precise, a preexisting financial statement was sent over by somebody, and it was never established who sent over either financial statement from Lund Partners to Leader's Bank. Mr. Beal, one general question that I had after reading your brief was what evidence you actually were not able to present and whether you made a record through an offer to prove or otherwise of such evidence. With respect to two examples of what we were not able to introduce was aircraft purchase agreement and aircraft lease agreement, which were in a defense exhibit book that the court and the prosecutor had. This was the April aircraft deal? Yes. Pippin had bought an aircraft shortly before the $1.4 million loan, and Mr. Lund had- You offered testimony about that, right? And I was preparing to try and offer the document, and I asked for a sidebar to discuss doing that, and he refused to have a sidebar. That's right at the point where the Pippin testimony ends and the Garris testimony starts. And so I just gave up, and I also gave up at that point on the aircraft lease agreement. And the significance of the lease agreement is that the bank internal document for the leasing says it's for the purchase of an aircraft, even though the money is sent to a leasing company. And in terms of then making a record and offer of proof, this was my deficiency in this case, and I have to say I have never run into this kind of obstruction by a district court judge in this district. I've tried 30 jury trials in this district, and I was completely blindsided by the way Judge Norgo conducted this trial, and the result was I was not prepared to make the kind of record that I now know you've got to do when you're in his courtroom. You're in your rebuttal time, Mr. Pippin. Let me then just make one point. The objections were compounded by the government, and the government was constantly objecting to relevancy, and Mr. Yadin said that unless it goes to misrepresenting the securities, the Morgan, Stanley, unless it goes to misrepresenting whether Garris actually wanted the loan, it's not relevant. He repeatedly made that objection. That's at page 785 of the transcript, and the judge sort of bought into that, and so the government compounded what the judge was doing in obstructing the testimony of Mr. Lund, and I would reserve the remainder of my time for rebuttal. Certainly, Mr. Beal. Mr. Fullerton. Good morning. May it please the court. My opponent has talked about two areas of evidence. He has two complaints about district court's rulings in the trial in this case. One is about the net worth testimony, but it's important to remember that Lund's net worth, testimony about evidence about Lund's net worth was entirely irrelevant in this case. Lund's net worth testimony was designed to show that somehow, even though the financial statements were inaccurate, and he did not own the millions of dollars in Lehman Brothers and Morgan Stanley stock that his financial statements reflected, that he was worth a lot of money. Well, that's not a defense to bank fraud, and it posed a danger of confusion and misleading the jury, and it was irrelevant. Nevertheless, Mr. Lund was able to introduce that testimony. Now, there's some complaint about the manner in which that testimony came in, but the district court was within its discretion to require specificity from Mr. Lund when he testified. Mr. Lund was, I believe, the record of the transcript shows that he was asked, do you have a recollection of what your net worth was at the time in the spring of 2001? And the objections followed, and the district court then required some specificity. Now, what were your assets, what were your liabilities, and what were they worth, and so on and so forth? Then the district, Lund testified in that manner and was able to introduce his net worth that way, even though it was irrelevant. He also did this through the introduction of that bankruptcy document that showed the, I think he introduced it during the cross-examination of a government trustee's office witness, which showed the final disposition of his assets in bankruptcy, and he was able to argue in closing that all of his creditors got paid, and it was essentially a no harm, no foul type argument. That was, it was really an irrelevant defense to the charge that he had lied in his personal financial statements, but nevertheless, he was able to introduce it. So I'm not sure what the complaint is here. The district court required specificity on the net worth. That was not an abuse of discretion. Mr. Lund was able to introduce the testimony, and he hasn't pointed to any prejudice that resulted. With regard to the Pippin contract, this is the second area my opponent has talked about this morning. As Your Honor, Judge Hamilton pointed out, there was testimony, Lund introduced testimony, about the somewhat complicated area involving Pippin's loans and purchase of an airplane and so on and so forth. But the testimony was, well, the defense was that the bank had made a mistake in September of 2002, that Lund had in fact told the bank that the purpose of the $1.4 million Pippin loan in September 2002 was for a real estate investment. The defense was further that when the bank recorded in its documents that Lund had said the purpose of the September 2002 loan was an airplane purchase contract, that was a mistake on the bank's part. It had simply copied and pasted from a set of documents that it had earlier, somehow mistaking what Lund had said. That evidence was available for Mr. Lund to make the argument because in fact the bank witnesses had testified that Pippin had taken out a loan in March 2002. The bank's records for that loan showed that Lund had said that that loan, the March 2002 loan, was to purchase half or 50% share of an airplane. And therefore, this defense that the bank had simply copied and pasted what Lund had told them was available to Lund in closing argument without introducing the actual contract or the actual lease that Pippin had entered into. It's not clear at all what those documents would have added to the defense, because whether or not Pippin actually purchased an airplane in April 2002 was irrelevant to the question whether Lund had lied to the bank about the purpose of the September loan. The district court properly, I believe, sustained the government's objections to the Pippin contract. Lund was not a party to the Pippin airplane purchase contract. Lund did not establish that he had personal knowledge of the Pippin contract, and it was irrelevant. In any event, Mr. Lund has not established that he was prejudiced by the exclusion of the Pippin contract, April 2002 Pippin contract, or the Pippin lease contract. There's been no showing that Mr. Lund was prejudiced by the exclusion of that irrelevant, or if at all relevant, very tangentially relevant evidence. Unless the court has questions regarding the subject, we'd ask that this court affirm the judgment and sentence of the district court. Thank you, Mr. Fullerton. Anything further, Mr. Beall? Yes, briefly, Judge. I know that's what we always say. With respect to the, just one point I want to make with respect to the line of credit with the bank, Mr. Lund, and it's in the record, was one of the founders of that bank a very few years before. And the bank very much wanted to lend him money so that he would be a customer of the bank, so that he could encourage his high net worth clients to also be customers of that bank. And so their interest was more in having him as a customer than worrying about what his assets were. I just would like to make that point. Secondly, with respect to the Pippin loan and those two contracts, Mr. Lund negotiated those contracts for Pippin, the other plane and the leasing. Those were his deals with Pippin, and the contracts would corroborate that. It's not enough to somehow have information seep into the record. You have to convince the jury. And the judge's continual impediments to the testimony rendered it essentially incomprehensible to the jury and deprived Mr. Lund of the right to convincingly present his case the way he wanted to present it. The case is taken under advisement.